UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


LOUISIANA ATHLETICS DOWN ON THE
BAYOU, L.L.C.                          CIVIL ACTION

VERSUS                                 NUMBER 11-303-BAJ-SCR

BAYOU BOWL ASSOCIATION


**RULING**

This matter is before the Court on the motion for summary
judgment filed by the Bayou Bowl Association ("Defendant").[1]
Plaintiff Louisiana Athletics Down on the Bayou, LLC ("Louisiana
Athletics" or "Plaintiff") has opposed the motion.[2]   For the
reasons which follow, the Court finds that the Defendant's motion
for summary judgment should be granted.

I.   **Factual Background**

Plaintiff brings this trademark infringement action claiming
that it owns the trademark "Bayou Bowl."  The defendant Bayou Bowl
Association is a non-profit corporation that plans the annual
"Bayou Bowl," a football game played between teams of graduated
high school seniors from Louisiana and Texas since 2003.  The first
Bayou Bowl game was played on June 21, 2003.  This game was planned

--------------------------------------------------

[1]Rec. Doc. No. 18.

[2]Rec. Doc. No. 23.

Doc#48071

by a steering committee which, at the time, was an unincorporated association.  Louisiana Athletics was formed on July 24, 2004.

Brian Rigby, owner of Louisiana Athletics, participated in forming the first Bayou Bowl game by recruiting the participating team and coaches from Louisiana.  Following the 2003 Bayou Bowl game, the Bayou Bowl Steering Committee terminated Brian Rigby. Rigby claims he created the name and concept of the Bayou Bowl in November of 2001.

The record reflects that Les Koenig, former executive director of the Greater Houston Coaches Association, and Dick Olin, another coach from Houston, met Rigby in 2002 and discussed creating an all-star game between Texas and Louisiana athletes.  Koenig testified that he and Olin began working on this game in August of 2002.[3]  Rigby testified that Koenig and Olin contacted him because they were interested in recruiting the Louisiana High School Coaches Association to participate.[4]  While the Louisiana High School Coaches Association refused, Koenig still requested Rigby put together a team from Louisiana to play in this game.  The Defendant argues that Rigby's role in the 2003 Bayou Bowl "coalition" was to organize the Louisiana team.  Koenig testified that Rigby assembled the Louisiana team, but it was the committee's

---

[3]Rec. Doc. No. 18-5, p. 4.

[4]Rec. Doc. No. 18-4, pp.3-4.

Doc#48071                              2

job to organize the event.[5]

Rigby testified that he performed the following in relation to preparing for the 2003 Bayou Bowl game: tried to set up a meeting between Texas coaches and the Louisiana High School Athletics Association and paid for the gas to transport students to the game, radio and TV promotional appearances, met parents, organized hotel rooms for kids, arranged meals when necessary, collected T-shirt and shoe sizes of kids, and sent e-mails to the media.[6]   Other actions to produce and promote the Bayou Bowl were taken by other members of the Bayou Bowl Steering Committee and consisted of: selecting the venue, selecting the charity, soliciting donations, selecting and purchasing team rings, selecting and purchasing apparel for both teams, selecting and paying for hotels, assembling the Texas team and coaches, and planning other activities associated with the game.[7]

### A.    Bayou Bowl Association's Arguments

The Defendant assumes only for the purposes of this motion that the allegation that Brian Rigby created the name "Bayou Bowl" is true.   The Defendant contends that all of the testimony and evidence in this case shows that the 2003 Bayou Bowl was planned by a committee or collaboration.   Further, Defendant argues that

---

[5]Rec. Doc. No. 18-5, p. 2-3.

[6]Rec. Doc. No. 18-5, pp. 11-13; p. 26; pp. 32-34.

[7]*Id.* at pp. 15-23; Rec. Doc. No. 18-2.

Doc#48071                           3

whether Rigby refers to the Bayou Bowl Steering Committee as a coalition, a collection of sponsors, or any other term, all of the evidence presented by Plaintiff in support of its commercial use of the trademark Bayou Bowl coincides with the dates that Rigby collaborated with this group of people. Plaintiff presents no evidence of commercial use by itself or Brian Rigby at any point in time prior to Rigby associating with other members of the committee.

Defendant contends that the newspaper articles produced by Plaintiff as evidence of "use" all refer to the Louisiana-Texas All Star Game as the "Bayou Bowl," and all refer to Rigby as "Bayou Bowl Board Member" and a "local liaison."[8] Defendant points out that none of the articles refer to Louisiana Athletics and two fail to even name Brian Rigby. None of these articles show "use" of the trademark Bayou Bowl by Louisiana Athletics at all or Rigby independent of the Bayou Bowl Steering Committee. Defendant also notes that Rigby's discussion on Barrett Murphy's local radio program clearly coincided with the organization of the 2003 Bayou Bowl.[9]

The Defendant also argues that all of Rigby's recruiting efforts coincide with his membership on the Bayou Bowl Steering Committee. The testimony of various coaches and players shows that

---

[8]Rec. Doc. No. 19-2, p. 7, quoting Rec. Doc. No. 18-18.

[9]See Rec. Doc. No. 18-7, p. 2.

Doc#48071                          4

the Bayou Bowl was already being planned with the Texas participants by the time Rigby contacted them.[10] In fact, Defendant contends there is no witness in this case who heard Rigby use the term Bayou Bowl independently of the coalition with the other members on the committee.

Defendant also contends that neither Rigby nor Plaintiff can point to any investment or expense they incurred related to the 2003 Bayou Bowl. Defendant contends all of the expenses associated with the Bayou Bowl were paid by the Bayou Bowl Steering Committee. Furthermore, Rigby's own testimony tellingly reveals that he was unaware how any of the expenses for the 2003 Bayou Bowl were paid.[11]

Following the 2003 Bayou Bowl game, the steering committee terminated Brian Rigby, and the Louisiana High School Coaches Association began coordinating players and coaches for the team from Louisiana. Koenig testified that he was asked by the committee to let Rigby know they would no longer be doing business with him because they preferred to work with an association.[12] Defendant contends Rigby and Louisiana Athletics have not conducted or participated in another event called the Bayou Bowl since 2003.

Defendant contends that, although Louisiana Athletics registered the trademark "Bayou Bowl" in 2008, five years after the

---

[10]Rec. Doc. No. 18-12, p. 6; Rec. Doc. No. 18-15, p. 2.

[11]Rec. Doc. No. 18-4, p. 30.

[12]Rec. Doc. No. 18-5, p. 8.

Doc#48071                                          5

2003 Bayou Bowl game, there is no evidence that Louisiana Athletics ever engaged in commercial use of the trademark. Louisiana Athletics has never organized another game called the Bayou Bowl, has never sold or marketed materials with this trademark, and did not reference any expenses related to a "Bayou Bowl" on any tax returns filed. There is no record of any expense which Plaintiff can attribute to the use of the trademark Bayou Bowl. Plaintiff never created any advertisement or promotions using the trademark.

Defendant argues that Plaintiff attached materials to its trademark application relating to the 2003 Bayou Bowl game which played before Louisiana Athletics came into existence. Defendant further notes Louisiana Athletics' admission that all materials attached to the trademark application were created by other members of the Bayou Bowl Steering Committee and not Brian Rigby.[13] Plaintiff attached a logo to the trademark application which was created by Dick Olin, a member of the original Bayou Bowl Steering Committee. Rigby testified that he did not know who created the logo even though he offered it as evidence of Louisiana Athletics' "use" of the trademark.[14]

In contrast, Defendant contends it has continuously used the term "Bayou Bowl" in every Bayou Bowl game planned and organized since 2003. Defendant offers evidence that it hosts multiple

---

[13]Rec. Doc. No. 18-6; Rec. Doc. No. 18-4, pp. 65-66.

[14]Rec. Doc. No. 18-6, pp. 60-62, pp. 92-94.

Doc#48071                                6

events annually in conjunction with the Bayou Bowl game to promote and raise funds. Defendant also claims it promotes and advertises the Bayou Bowl with T-shirts, game programs, rings and jerseys. The Bayou Bowl Association also maintains a website, and notes that the game is televised annually and covered by various media outlets throughout Texas and Louisiana.

### B. Louisiana Athletics' Arguments

Louisiana Athletics contends that for the 2003 Bayou Bowl to take place, only four elements were actually required: (1) a Louisiana delegation, (2) a Texas delegation, (3) a venue, and (4) a name for the game.[15] Brian Rigby contends he was responsible for recruiting and coordinating the Louisiana participants for the 2003 game. He argues that he had already begun initiating interest in the game prior to being contacted by the Texas delegation. He also testified that he was supposed to be the director of the bowl, "but Mr. Koenig usurped the title for himself."[16] Rigby also stated that "[f]or all practical purposes to anyone in Louisiana participating in that initial game, [he] was the Bayou Bowl."[17]

Plaintiff disputes Defendant's assertion that Rigby did not select the venue. Plaintiff contends Rigby was shown a number of venues and ultimately "signed off" on the chosen site. Rigby

---

[15]Rec. Doc. No. 23, p. 2.

[16]Rec. Doc. No. 18-4, pp. 35-36, pp. 38-40.

[17]Rec. Doc. No. 23, p. 3.

Doc#48071                                           7

testified that the Texas committee members sought his advice and consent in agreeing on a location for the game.

Plaintiff notes that the Defendant concedes that Rigby created the name Bayou Bowl for the purposes of this motion; therefore, this fact must be accepted as true by the Court in deciding this motion.

With respect to the expenses incurred by the Bayou Bowl Steering Committee, Plaintiff contends these activities were "ancillary" to the game and not essential. Plaintiff also contends that since the 2003 game was to be played in Texas, it was understood among the committee members that the Texas delegation would seek financing for the 2003 game, and that Rigby would seek financing the following year when the game was to be played in Louisiana.[18]

Plaintiff also argues that Koenig's testimony confirms that Rigby was "ousted" from the committee after bringing the first Bayou Bowl game to fruition. Rigby contends he was never "terminated" as no employment relationship ever existed.

Finally, Rigby testified that he was concerned about confusion among high school players, coaches and parents regarding the use of the name Bayou Bowl. For this reason, he contacted an attorney and and took the necessary steps to preserve and protect his mark.

Plaintiff argues that, although Rigby did not plan and oversee

_____

[18]Rec. Doc. No. 18-4, pp. 29-30.

Doc#48071                                        8

every single aspect and detail of the 2003 Bayou Bowl, without his "extensive involvement," the game would never have taken place.[19] Plaintiff also argues that because Rigby was a member of the Bayou Bowl Steering Committee, any actions taken by the committee are attributable to him regardless of whether he directly undertook such actions.

Plaintiff also points out that the Defendant never challenged the validity of the trademark during the publication period. Plaintiff contends that since the Defendant admitted to knowing about the application and did nothing to object, Defendant did not take any action to prevent Plaintiff from using the mark. Plaintiff contends this inaction by the Defendant creates a genuine issue of material fact which precludes granting summary judgment.

Plaintiff has sued the Defendant for alleged violations of the Lanham Act, violations under the common law of unfair competition and infringement, and violations of the Louisiana Unfair Trade Practice and Consumer Protection Law ("LUTPA"). Defendant filed a counterclaim seeking to enjoin Plaintiff's further use of the trademark Bayou Bowl and for cancellation of the trademark.

## II.  Law and Analysis

### A.    Summary Judgment Standard

Summary judgment should be granted if the record, taken as a whole, "together with the affidavits, if any, show that there is no

---

[19]Red. Doc. No. 23, p. 9.

Case 3:11-cv-00303-BAJ-SCR   Document 25   05/14/13   Page 9 of 30

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[20]  The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[21]  A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[22]  If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response."[23]

If the moving party meets this burden, Rule 56 (c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which

---

[20]Fed. R. Civ. P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996); *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 758 (5th Cir. 1996).

[21]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  See also *Gunaca v. Texas*, 65 F.3d 467, 469 (5th Cir. 1995).

[22]*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (quoting *Celotex*, 477 U.S. at 323-25, 106 S.Ct. at 2552).

[23]*Id.* at 1075.

Doc#48071                        10

there is a genuine issue for trial.[24]  The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.[25]  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[26]  The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[27]  Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.[28]

**B.   Lanham Act Violations**

**1.    Trademark Infringement/False Designation of Origin**

Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), governs

---

[24]*Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).

[25]*Little*, 37 F.3d at 1075;  *Wallace*, 80 F.3d at 1047.

[26]*Wallace*, 80 F.3d at 1048 (quoting *Little*, 37 F.3d at 1075).  *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).

[27]*McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995), *as revised on denial of rehearing*, 70 F.3d 26 (5th Cir. 1995).

[28]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Doc#48071                              11

lawsuits for the infringement of a federally registered trademark.[29]
A defendant is liable for infringement if, "without consent of the
registrant, he uses 'in commerce any reproduction, counterfeit,
copy or colorable imitation of a registered mark [that] ... is
likely to cause confusion, mistake, or to deceive.'"[30] To establish
a trademark infringement claim, a plaintiff or senior user must
show: "(1) that it owns a valid trademark; and (2) that the
defendant's - or junior user's - use of the contested mark is
likely to cause confusion."[31]

Plaintiff also brings claims under §43(a)(c) of the Lanham Act
for false designation of origin, 15 U.S.C. § 1125 (a)& (c).  The
United States Supreme Court stated that "[t]he Lanham Act was
intended to make 'actionable the deceptive and misleading use of
marks,' and 'to protect persons engaged in ... commerce against
unfair competition.'"[32] "While much of the Lanham Act addresses the
registration, use, and infringement of trademarks and related
marks, § 43(a), 15 U.S.C. § 1125(a) is one of the few provisions

---

[29]*Compton v. Fifth Avenue Association, Inc.*, 7 F.Supp.2d
1328, 1331 (M.D. Fla. 1998).

[30]*Id.* at 1331, quoting 15 U.S.C. § 1114(1).

[31]*Id.*, citing *Dieter v. B&H Industries*, 880 F.2d 322, 326
(11th Cir. 1989); *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512
(11th Cir. 1984).

[32]*Dastar Corporation v. Twentieth Century Fox Film
Corporation*, 539 U.S. 23, 28, 123 S.Ct. 2041, 2045, 156 L.Ed.2d
18 (2003), quoting 15 U.S.C. § 1127.

Doc#48071                              12

that goes beyond trademark protection."[33]  "As originally enacted, § 43(a) created a federal remedy against a person who used in commerce either 'a false designation of origin, or any false description or representation' in connection with 'any goods or services.'"[34] However, "§ 43(a) 'does not have boundless application as a remedy for unfair trade practices.'"[35]

Courts have noted that "trademarks are devices intended to identify fully developed products and services, not ideas for products or services."[36]  A trademark includes "'any word, name, symbol, or device, or any combination thereof' used to distinguish goods or products from those manufactured or sold by others and to identify the source of a particular good or service."[37] Furthermore, "'[m]ere invention, creation, or discussion of a trademark does not create priority rights.'"[38]

Analyzing this section of the Lanham Act, the United States

--------

[33]*Id.*

[34]*Id.* at 29, 123 S.Ct. at 2045.

[35]*Id.*, quoting *Alfred Dunhill, Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (C.A.2 1974).

[36]*Keane v. Fox Television Stations, Inc.*, 297 F.Supp.2d 921, 933 (S.D. Tex. 2004)(See, *Sport Supply Group, Inc. v. Columbia Casualty Co.*, 335 F.3d 453, 460-61 (5th Cir. 2003))(noting that "the primary function of a trademark is to serve as a label - a mark that identifies and distinguishes a particular product").

[37]*Id.* at 933-34, quoting 15 U.S.C. § 1127 (2003).

[38]*Id.* at 934, quoting *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*,811 F.2d 1470, 1473 (Fed. Cir. 1987).

Case 3:11-cv-00303-BAJ-SCR   Document 25   05/14/13   Page 13 of 30

Supreme Court "emphasized that the phrase 'origin of goods' in the statute's text does not connote 'the person or entity that originated the ideas or communications' that the resulting commercial product embodies or contains.[39] Instead, section 43(a) is intended to protect against consumer confusion and a producer's loss of good will by creating a means to sue parties who endeavor to exploit the name recognition that a pre-existing producer has created in the marketplace."[40] The Supreme Court recognized that "consumers do not assume or care whether the idea for a branded product originated with company 'X,' which is why the Lanham Act does not protect the source of content per se; if it did, it would 'conflict with the law of copyright, which addresses that subject specifically.'"[41] Furthermore, "[f]ederal trademark law is not concerned with 'invention or discovery' of ideas, and the Court explicitly cautions against extending trademark law in that manner."[42] Stated another way, "the Lanham Act does not create a cause of action for 'plagiarism,' that is, 'the use of otherwise unprotected works and inventions without attribution.'"[43]

---

[39] *Id.* at 935, quoting *Dastar*, 123 S.Ct. at 2047.

[40] *Id.*

[41] *Id.*, quoting *Dastar*, 123 S.Ct. at 2048.

[42] *Id.*, quoting *Dastar*, 123 S.Ct. at 2048 (quoting *In re Trade-Mark Cases*, 100 U.S. 82, 94, 25 L.Ed. 550 (1879)).

[43] *Id.*, quoting *Dastar*, 123 S.Ct. at 2049.

Case 3:11-cv-00303-BAJ-SCR   Document 25   05/14/13   Page 14 of 30

## a.  Use Requirement

Liability under section 1125(a) "hinges on the likelihood of confusion in the marketplace regarding the source of a particular good or service."[44]  "However, for a court to consider the 'likelihood of confusion,' a plaintiff must plead facts demonstrating that, through its use in commerce, the plaintiff had won the race to the marketplace such that it owns the exclusive right to use a particular mark."[45]  However, "[w]inning the race to the marketplace is not accomplished by being the first in time to use a mark, but requires both appropriation of the mark and use of the mark in trade."[46]  A plaintiff "must have done far more than use the mark in discussions, solicitations, shipments, or even in some sales."[47]  The "[p]reparing to sell goods or services under a

---

[44] *Id.*, citing *Sport Supply Group*, 335 F.3d at 460.

[45] *Id.*, citing *Lucent Information Management, Inc. v. Lucent Technologies, Inc.*, 186 F.3d 311, 315 (3d Cir. 1999), *cert. denied*, 528 U.S. 1106, 120 S.Ct. 845, 145 L.Ed.2d 714 (2000); *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1266 (5th Cir. 1975); *Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 929 (8th Cir. 1967); *Rolley, Inc. v. Younghusband*, 204 F.2d 209, 212 (9th Cir. 1953).

[46] *Id.*, at 936, citing *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); 2 J. THOMAS MCCARTHY, MC CARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:11 (4th ed. 1997)("The mere fact that a party conceived the idea of a trademark and discussed it with others does not establish priority as of the date of those events.").

[47] *Id.* (See, *e.g.*, *Zazu*, 979 F.2d at 503.

Doc#48071                                   15

particular label, shipping marked merchandise to stores, making sales to intra-corporate personnel, and even 'actively soliciting accounts' has been deemed inadequate to satisfy the requisite 'use in commerce' necessary to acquire trademark rights."[48] Courts have held that "[t]he use must have been sufficiently public to have 'allow[ed] consumers to associate a mark with particular goods' and to have 'notifie[d] other firms that the mark is so associated.'"[49] "Therefore, a plaintiff can prevail only by showing prior use of the mark 'in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark.'"[50]

For trademarks, the "use in commerce" requirement is met when a mark is "(1) placed on the good or container, or on documents associated with the goods if the nature of the goods makes placement on the good or container impracticable, and (2) that good is then 'sold or transported in commerce.'"[51] "The registration of a mark that does not meet the use requirement is void *ab initio*."[52]

Courts have held that, "[w]ithout question, advertising or

---

[48]*Id.*, citing *Blue Bell*, 508 F.2d at 1265-66.

[49]*Id.*, quoting *Zazu*, 979 F.2d at 503.

[50]*Id.*, quoting *Blue Bell*, 508 F.2d at 1266.

[51]*Aycock Engineering, Inc. v. Airflite, Inc.*,560 F.3d 1350, 1357 (Fed.Cir. 2009), quoting 15 U.S.C. § 1127 (2006).

[52]*Id.* (See *Gay Toys, Inc. v. McDonald's Corp.*, 585 F.2d 1067, 1068 (CCPA 1978); 3 McCarthy § 19:112.

Doc#48071                          16

publicizing a service that the applicant intends to perform in the future will not support registration."[53] Rather, "the advertising or publicizing must relate to 'an existing service which has already been offered to the public.'[54] Furthermore, 'mere adoption (selection) of a mark accompanied by preparations to begin its use are insufficient ... for claiming ownership of and applying to register the mark.'"[55] Thus, "an applicant's preparations to use a mark in commerce are insufficient to constitute use in commerce. Rather, the mark must actually be used in conjunction with the services described in the application for the mark."[56]

The case *Compton v. Fifth Avenue Association, Inc.*,[57] is remarkably factually similar to the case at bar and is directly on point in the analysis and decision of the *Compton* court. In *Compton*, the plaintiff was a former member of the Board of Directors for the Shelter for Abused Women of Collier County[58] and was former chairman of the fund-raising committee. In April of

---

[53]*Id.* at 1358, citing *In re Cedar Point, Inc.*, 220 USPQ 533, 536 (TTAB 1983)(quoting *Intermed Commc'ns, Inc. v. Chaney*, 197 USPQ 501, 507-08 (TTAB 1977)); *Greyhound Corp. v. Armour Life Ins. Co.*, 214 USPQ 473, 474 (TTAB 1982).

[54]*Id.*, quoting *Greyhound*, 214 USPQ at 474.

[55]*Id.*, quoting *Intermed*, 197 UPSQ at 507; see *Blue Bell*, 497 F.2d at 437.

[56]*Id.* at 1360.

[57]7 F.Supp.2d 1328 (S.D. Tex. 1998).

[58]Hereinafter referred to as "the Shelter."

Doc#48071                                    17

1993, Compton and another friend discussed the possibility of a non-profit street-painting festival in Naples, Florida. After this discussion, the two conceived of the name "Via Colori" for the event. Compton's friend later transferred any interest she possessed in "Via Colori" to Compton. At Compton's suggestion, the Shelter's Board of Directors adopted the name "Via Colori" to designate its street-painting fundraiser to take place in May of 1994.[59]

The first "Via Colori" festival took place in May of 1994 with the second and third following in April of 1995 and April of 1996. At the time of the 1994 and 1995 festivals, Compton was both a member of the Shelter's Board of Directors and chair of the fund-raising committee. However, in 1996, he was no longer on the Board but continued to chair the fund-raising committee. Each festival was funded and staffed by the Shelter. All advertisements indicated that "Via Colori" was to benefit the Shelter, and all proceeds went to the Shelter.[60]

During the summer of 1995, Compton filed an application to register the mark "Via Colori," which included an affidavit wherein Compton swore that he knew of no other person, firm, corporation or

---

[59]7 F.Supp.2d at 1329.

[60]*Id.*

Doc#48071                              18

association that possessed the right to use the mark.[61]  In May of
1996, Compton told Shelter President Martha Gill that he had
registered "Via Colori" for use as a trademark under his own name.
Subsequently, the Shelter attempted a joint-venture agreement with
the Fifth Avenue Association for a new name for the 1997 festival
since Compton had warned the Shelter that he would not allow "Via
Colori" to be used in conjunction with the 1997 event on Fifth
Avenue.  It was ultimately agreed that the 1997 event would be
called "the Festival of Colors."[62]

Because advertisements for the "Festival of Colors" referenced
prior "Via Colori" events, Compton filed suit against the Shelter
and Fifth Avenue.  Compton alleged trademark infringement, common-
law unfair competition, and violation of section 43(a) of the
Lanham Act.  The defendants sought declaratory relief and
cancellation of Compton's registration.  Defendants moved for
summary judgment on all claims.[63]

Noting that ownership of a mark, both under the Lanham Act and

---

[61]It should be noted that in the case at bar, there is no
evidence that Plaintiff ever submitted such an affidavit or that
the current trademark application process requires one; however,
in the application submitted by Plaintiff, the space for a
"Concurrent Use Claim" was left blank. (Rec. Doc. No. 18-21, p.
4).  The Defendant claims the Plaintiff purposely failed to
disclose the use of the Bayou Bowl mark by the Bayou Bowl
Association to fraudulently obtain registration of the mark.

[62]7 F.Supp.2d at 1329-30.

[63]*Id.* at 1330.

common law, is determined by use, and specifically priority of use, the court stated: "[T]he fact that Compton first conceived of the mark 'Via Colori' is irrelevant to his ownership of the mark.[64] Likewise, registration of a mark, unaccompanied by prior use, does not create ownership."[65]

The court found that it was undisputed that the first and only entity to use the mark "Via Colori" was the Shelter. The court noted the minutes from the 1994 board meeting reflecting that "Via Colori" was established as the signature event. The court also noted that Compton admitted that the only "Via Colori" events conducted prior to the lawsuit were intended as fund-raisers for the Shelter with the goal being to associate "Via Colori" with the Shelter in the public's eye. For these reasons, the court held that there was no genuine issue of material fact as to the lack of prior use of the mark "Via Colori" by Compton. The court also found that no genuine issue of fact existed as to Compton's lack of ownership of the mark. For these reasons, the court granted summary judgment in favor of the Shelter and Fifth Avenue on the trademark infringement claims.[66]

In the case at bar, it is clear to the Court that Plaintiff has failed to establish the use requirement under the law. As in

---

[64] *Id.* at 1331, citing *Hydro-Dynamics*, 811 F.2d at 1473.

[65] *Id.*, citing *Hydro-Dynamics*, 811 F.2d at 1473.

[66] *Id.* at 1331-32.

Doc#48071                                20

*Compton*, Plaintiff cannot rely on the actions taken by Rigby prior to the 2003 Bayou Bowl game since it is well-established that a plaintiff "must have done far more than use the mark in discussions, solicitations, shipments, or even in some sales."[67] The law is also clear that "preparations to use a mark in commerce are insufficient to constitute use in commerce."[68] The majority of activities Plaintiff offers to support its claims are Rigby's preparatory actions for the 2003 Bayou Bowl game. The fact that Rigby may have discussed a game he called the "Bayou Bowl" prior to the formation of the Steering Committee does not constitute rendering a service associated with the mark as required by the law. Plaintiff has never used the mark in commerce itself and has failed to present summary judgment evidence that it has continued to plan and hold events known as the Bayou Bowl.

Despite Plaintiff's arguments to the contrary, the record in this case reflects that prior to meeting with the organizers of the Bayou Bowl Steering Committee, Rigby had taken no steps to actually organize a game called the Bayou Bowl. All of Rigby's documented recruiting and promotional efforts took place in conjunction with the plans of the Bayou Bowl Steering Committee. Furthermore, the fact that Rigby was a member of the committee does not attribute all committee actions to Rigby such that ownership of the trademark

---

[67]See *supra,* n. 47.

[68]See *supra,* n. 56.

Doc#48071                              21

was passed to him. There is no evidence that Rigby ever used the mark independent of his membership in the Bayou Bowl Steering Committee and in preparation for the 2003 game. The first Bayou Bowl game was produced by committee or collaboration, not by Rigby alone, despite Plaintiff's suggestion that without Rigby, the 2003 game would not have taken place.

Furthermore, Plaintiff's claim that Rigby created the name Bayou Bowl is also irrelevant to ownership of the mark. In *Compton*, the parties acknowledged that Compton had created the name "Via Colori," but the court clearly held that "the fact that Compton first conceived of the mark 'Via Colori' is irrelevant to his ownership."[69] For the same reasons set forth in *Compton*, Plaintiff has failed to establish prior use of the trademark in commerce, and in doing so has failed to prove its ownership of the mark "Bayou Bowl." The law is clear that Plaintiff's registration of the mark, unaccompanied by prior use, does not create ownership.[70]

### b. Abandonment

The Defendant also claims that there is sufficient summary judgment evidence that the Plaintiff has abandoned the trademark Bayou Bowl. Under the Lanham Act, a mark is deemed "abandoned"

[w]hen its use has been discontinued with intent not to

---

[69]See *supra*, n. 62.

[70]See *supra*, n. 63.

Case 3:11-cv-00303-BAJ-SCR   Document 25   05/14/13   Page 22 of 30

resume such use.  Intent not to resume may be inferred from the circumstances.  Nonuse for three consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means bona fide use of that mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.[71]

"The party asserting abandonment 'must establish that the owner of the mark both (1) discontinued use of the mark and (2) intended not to resume its use.  The burden of proof is on the party claiming abandonment.'"[72]  Furthermore, "'the owner of a trademark cannot defeat an abandonment claim ... by simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date.'"[73]

The Defendant contends that, even assuming the Plaintiff could attribute "use" of the mark by Rigby's actions, the Plaintiff has failed to show any commercial use of the name since 2003. Defendant argues that Plaintiff has not planned an event called the Bayou Bowl or used the trademark to advertise any service it provided.  As such, because more than three years have elapsed without the Plaintiff "using" the trademark, the Defendant argues

---

[71]*Vais Arms, Inc. v. Vais*, 383 F.3d 287, 293 (5th Cir. 2004), quoting 15 U.S.C. § 1127.

[72]*Id.*

[73]*Id.* at 294, quoting *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 537 (4th Cir. 2000); see also MCCARTHY ON TRADEMARKS § 17:13("If all a party had to do to avoid a holding of abandonment was to testify that he never had any intent not to resume use, then no mark would ever be held abandoned.")(citing *Golenpaul v. Rosett*, 174 Misc.114, 18 N.Y.S.2d 889 (N.Y.Sup.Ct.1940)).

Doc#48071                                    23

it has made a prima facie case of abandonment. The Defendant further argues that the only action taken by the Plaintiff to override a presumption in favor of abandonment is the retention of an attorney and notifying the committee members by Rigby that he "owned" the mark. The Defendant contends this does not constitute "use in commerce" but rather is solely directed at the prevention of use by others which cannot interrupt abandonment as a matter of law.

The Fifth Circuit has held that "[t]he Act does not allow the preservation of a mark solely to prevent its use by others."[74] Therefore, Plaintiff's argument that Plaintiff's registration of the mark "alone could rebut any assertion that Plaintiff no longer intended to resume its use,"[75] is incorrect as a matter of law. Likewise, the filing of this lawsuit, also an action taken to prevent use of the mark by others, cannot rebut abandonment. Plaintiff submits no other argument, activity, or evidence which would overcome the prima facie case of abandonment of the mark.

For these reasons, the Court finds that there are no genuine issues of material fact as to the ownership of the trademark, and the Defendant is entitled to summary judgment on the Plaintiff's claims of trademark infringement and false designation of origin.

---

[74]*Exxon Corp. v. Humble Exploration Co., Inc.*, 695 F.2d 96, 101(5th Cir. 1982).

[75]Rec. Doc. No. 23, p. 12.

Case 3:11-cv-00303-BAJ-SCR   Document 25   05/14/13   Page 24 of 30

In the alternative, even if the Plaintiff could prove ownership of the mark, Plaintiff has failed to present summary judgment evidence to rebut the prima face case of abandonment set forth by the Defendant.

### 2.   Dilution of Trademark

The Trademark Dilution Revision Act ("TDRA"), 15 U.S.C. § 1125(c), bars another person's commercial "'use of a mark or trade name in commerce [in a manner] that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of the actual or likely confusion...'"[76] In order to state a claim for dilution under the TDRA, a plaintiff must show that (1) it owns a famous and distinctive mark; (2) that defendant commenced using plaintiff's mark in a manner that dilutes those marks; (3) that the similarity between the marks gives rise to an association between the two marks; and (4) that the association is likely to impair the distinctiveness of the original marks or harm the reputation of the original marks.[77]

Because the Court has found that Plaintiff failed to prove its ownership of the mark "Bayou Bowl," Plaintiff cannot satisfy the first requirement for stating a dilution claim under the TDRA.

---

[76]*National Business Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 (5th Cir. 2012), quoting 15 U.S.C. § 1125(c)(1).

[77]*Id.* (See *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 507 F.3d 252, 264-65 (4th Cir. 2007).

Accordingly, Defendant's motion for summary judgment is granted on Plaintiff's claim for dilution.

### 3. Cancellation

The Defendant has moved for injunctive relief preventing any further use of the trademark Bayou Bowl by the Plaintiff and also for cancellation of the trademark registered to Plaintiff.[78] The Lanham Act allows for cancellation of Principal Register registrations, by "one who 'believes that he is or will be damaged by the registration,' and for cancellation of Supplemental register registrations on the same ground."[79] The "'cancellation procedure is the "second backstop" along with opposition proceedings, to the ex parte examination of a mark by the Trademark Examiner.'"[80] To successfully petition for cancellation, "a petitioner must plead and prove two basic elements: (1) that it has standing to petition to cancel in that it is likely to be damaged by the registration; and (2) that there are valid grounds why the registration should not continue to be registered."[81]

The Court finds that the Defendant has easily met the standing

_____

[78]Defendant requested this relief in its Answer to the Complaint, Rec. Doc. No. 9, pp. 10-13.

[79]*Compton*, 7 F.Supp.2d at 1332, quoting 15 U.S.C. §§ 1064, 1092.

[80]*Id.*, quoting McCarthy, §§ 20:40.

[81]*Id.* (See, *e.g.*, *Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1557 (11th Cir. 1991); McCarthy, *supra*, § 20:41.

Doc#48071                                          26

requirement in this case. The purpose of standing "is simply to weed out 'intermeddlers' from those with 'a personal interest in the outcome beyond that of the general public.'"[82] Any assertion of a likelihood of confusion that is not "wholly without merit" will pass this test.[83] In this case, were Louisiana Athletics and the Bayou Bowl Association to both continue using the term "Bayou Bowl" in the regional area, the public would suffer confusion.

Under Section 2 of the Lanham Act, "prior use of a confusingly similar mark by the petitioner is grounds for cancellation of the registrant's mark."[84] The *Compton* court held that "[e]ven where the petitioner has not demonstrated its own prior use, '[i]n a petition to cancel a registration less than five years old, the allegation of non-use in commerce is a proper ground [for cancellation].'"[85] Clearly, the grounds for cancellation in the case at bar are the same as those that "fatally undermined" Plaintiff's infringement claim - Plaintiff's failure to use, and Defendant's prior use of, the mark "Bayou Bowl."[86]

Plaintiff contends in its opposition that the Defendant knew

---

[82]*Id.*, quoting *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 U.S.P.Q. 185, 188 (C.C.P.A. 1982).

[83]*Id.* (See *Lipton*, 670 F.2d at 1024).

[84]*Id.* at 1333, citing McCarthy, *supra*, § 20:53.

[85]*Id.*, quoting McCarthy, *supra*, § 20:54.

[86]*Id.*

Case 3:11-cv-00303-BAJ-SCR   Document 25   05/14/13   Page 27 of 30

of the registration application back in 2008 and failed to oppose it at that time.  Thus, Plaintiff contends this should preclude the Defendant from now seeking cancellation of the mark.  To the extent that Plaintiff may be asserting the defense of laches,[87] the Court will address the requirements.

Laches is commonly defined as "inexcusable delay that results in prejudice to the defendant."[88]  A laches defense consists of three elements: "'(1) delay in asserting a right or claim; (2) that the delay was inexcusable; and (3) that undue prejudice resulted from the delay.'"[89]

Assuming without deciding that Plaintiff could satisfy the first and second requirements listed above, Plaintiff has failed to present any argument or evidence to satisfy the third requirement, that it has suffered undue prejudice from the delay.  As stated many times herein, there is no evidence that the Plaintiff ever planned or executed an event called the "Bayou Bowl" since its inception while extensive evidence shows the Defendant has continually done so.  Therefore, to the extent that Plaintiff's

---

[87]The Court notes that Plaintiff did not answer or oppose the cancellation allegations made by Bayou Bowl in its counter-claim.

[88]*Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998), citing *Conan Properties, Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985).

[89]*Id.*, quoting *Armco, Inc. v. Armco Burglar Alarm Co., Inc.*, 693 F.2d 1155, 1161 (5th Cir. 1982).

Doc#48071                                      28

argument in its opposition constitutes an assertion of the defense of laches, the Court finds this defense is without merit.

Cancellation of the Plaintiff's registration is further supported by the Court's holding that Plaintiff has failed to prove the "use in commerce" sufficient to establish its ownership of the mark. The law clearly states, "[t]he registration of a mark that does not meet the use requirement is void *ab initio*."[90] Accordingly, summary judgment on the Defendant's counter-claim for cancellation of the mark is granted.

### C.  Common law unfair competition and infringement[91]

Plaintiff also alleges a claim for common law unfair competition and trademark infringement. Under Louisiana law, determining whether one has a protectable proprietary right in a trademark or trade name, a party must first show actual prior use of a mark or name.[92] Because the analysis and result is essentially the same as discussed above for the claims under the Lanham Act, summary judgment is granted as to this claim as well.

---

[90]See *supra*, n. 52.

[91]The Court exercises supplemental jurisdiction over the Plaintiff's claims arising under state law pursuant to 28 U.S.C. § 1367(a). The Court finds that Plaintiff's claims under state law are so related to the Plaintiff's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative fact.

[92]*Ramsey's Manufacturing Jewelers, Inc. v. Ramsey*, 05-307 (La. App. 5 Cir. 2/14/06), 924 So.2d 1045, 1051, citing *Gulf Coast Bank v. Gulf Coast Bank & Trust Co.*, 94-2203, p. 1 (La. 4/10/95), 652 So.2d 1306, 1308.

Doc#48071                                              29

### D.   Louisiana Unfair Trade Practices Act ("LUTPA")[93]

Plaintiff claims that the Defendant's alleged actions also constitute unfair trade practices under Louisiana law.   The requirements of LUTPA "'mirror those of the Lanham Act.'"[94] For the reasons stated, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's claim under LUTPA.

## III. Conclusion

For the reasons set forth above:

The Defendant's motion for summary judgment[95] is granted. Plaintiff's claims are dismissed with prejudice.

Judgment shall be entered accordingly.

IT IS SO ORDERED.

Baton Rouge, Louisiana, this 14th day of May, 2013.

_____
BRIAN A. JACKSON, CHIEF JUDGE
MIDDLE DISTRICT OF LOUISIANA

---

[93]La. R.S. 51:1401, *et. seq.*

[94]*Board of Supervisors of the Louisiana State University et al v. Smack Apparel Company*, 438 F.Supp.2d 653 (E.D. La. 2006), quoting *Prudhomme v. Procter & Gamble Co.*, 800 F.Supp. 390, 395 (E.D.La. 1992); see also, *Louisiana World Exposition, Inc. v. Logue*, 746 F.2d 1033 (5th Cir. 1984)("Likelihood of confusion is the essential ingredient for claims of unfair competition under both the Lanham Act and the Louisiana [unfair trade practices] statute").

[95]Rec. Doc. No. 18.